**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Michael King, et al., | No. CV-23-00196-PHX-SMB |
| Plaintiffs, | **ORDER** |
| v. | |
| DePuy Orthopaedics Incorporated, et al., | |
| Defendants. | |

Pending before the Court are several motions: Defendants' Motion to Exclude, In Part, The Opinions And Testimony of David Kessler, M.D. (Doc. 64); Defendants' Motion to Exclude, In Part, The Opinions and Testimony of William R. Evans, M.D., P.A. (Doc. 62); Defendants' Motion To Exclude, In Part, The Expert Opinions And Testimony Of Minette E. Drumwright (Doc. 61); and Defendants' Motion and Memorandum Of Law In Support Of Motion To Disqualify Plaintiffs' Expert Stephen Li (Doc. 30). Oral argument was held on August 28, 2023. After consideration of the documents, oral argument and relevant case law, the Court will grant some of the motions and deny others as discussed below.

**I.    BACKGROUND**

This case arose out of the installation of an allegedly defective "metal-on-metal" hip replacement manufactured, marketed, and sold by Defendants. This hip replacement is known as the Pinnacle Acetabular Cup System (hereinafter "device"). The device is used to replace diseased hip joints and was intended to remedy conditions such as osteoarthirits,

rheumatoid arthritis, avascular necrosis, or fracture. It also sought to provide patients with pain-free natural motion over a longer period of time than other hip replacement devices.

The device is composed of four components: "the metal femoral stem, which is inserted inside the femur bone; the metal femoral head (or ball), which connects to the top of the stem; the metal acetabular cup or shell (socket), which attaches to the pelvis; and the liner, which sits inside the acetabular cup." (Doc. 17 at 7.) The acetabular cup is made of titanium, while the liner is made of either plastic, ceramic, or cobalt-chromium, depending on the patient. This case involves an implant with a cobalt-chromium lining and is referred to as a metal-on-metal ("MoM") device. The MoM description designates devices containing the cobalt-chromium liner because "both articulating surfaces—the femoral head (ball) and the acetabulum liner (socket)—are comprised of cobalt-chromium metal." (*Id.*)

Plaintiffs allege that due to the friction between these two components, cobalt-chromium metal particles are released. The resulting particles accumulate in the patient's surrounding tissue and end up in the patient's bloodstream. This in turn can lead to metallosis, biological toxicity, pseudotumors, infection, inflammation, and an early and high failure rate of the device. (*Id.* at 6.) Plaintiffs also allege that the metal components corrode inside the body, leading to many of the same ailments. (*Id.* at 10.)

On June 28, 2010, Plaintiff Michael King underwent a total hip arthroplasty procedure in Mesa, Arizona and had a MoM device implanted in his left hip. After the procedure, Plaintiff alleges that the friction between the cobalt-chromium components caused metal ions and particles to be released into his blood, tissue, and bone surrounding the implant, resulting in severe pain, discomfort, and inflammation. Due to these symptoms, Plaintiff underwent a second surgery to replace the device on January 10, 2014.

Plaintiffs filed suit alleging negligence, strict liability, fraud, negligent misrepresentation, and breach of warranty claims. (*See* Doc. 17.) In addition, Mr. King's wife, Deborah King, filed a loss of consortium claim. (*See id.*) The case was initially filed in the United States District Court for the Northern District of Texas as part of the multi-

district litigation against Defendants coordinated out of that District. This case was not selected as one of the bellwether cases. *See In re: DePuy Orthopaedics, Inc.*, MDL Docket No. 3:11-MD-2244-K, 2016 WL 6271474, at *1 (N.D. Tex. Jan. 5, 2016). Therefore, it was consolidated for purposes of discovery and pretrial matters. *See id.*; 28 U.S.C. § 1407. Litigation continued in the bellwether cases, resulting in substantial fact and expert discovery. This case was transferred to the District of Arizona on December 30, 2022. (Doc. 41.)

Before the Court now are Defendants' Motions to exclude, in part, the opinions and testimony of three of Plaintiffs' expert witnesses—Minette E. Drumright, Ph.D. (Doc. 61), William Evans, M.D., P.A. (Doc. 62), and David Kessler, M.D. (Doc. 64.) These Motions address the qualifications of these experts and the reliability and relevance of the opinions to be proffered. Defendants also filed a Motion to Disqualify one of Plaintiffs' expert witnesses, Stephen Li, M.D. (Doc. 30.) The parties jointly requested to hear this Motion to Disqualify at the scheduled hearing on the other Motions, and the Court agreed. (Docs. 96; 97.) The Court will address each of these Motions below.

**II. LEGAL STANDARD**

A party seeking to present an expert's testimony carries the burden establishing that testimony's admissibility. *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007). Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) govern the admissibility of such testimony. Rule 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. *Daubert* entrusts courts to act as gatekeepers tasked with excluding unreliable expert testimony. 509 U.S. at 597; *see also Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022) ("Rule 702 tasks a district court judge with ensuring that

an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.") (cleaned up).

Expert testimony is admissible only if it is relevant and reliable. *Daubert*, 509 U.S. at 589. Expert testimony is "relevant" if it fits the facts of the case and logically advances "a material aspect of the proposing party's case." *Daubert v. Merrell Dow Pharms., Inc.* (*Daubert II*), 43 F.3d 1311, 1315 (9th Cir. 1995). Expert testimony is "reliable" if the expert's opinion is reliably based in the "knowledge and experience of the relevant discipline." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013) (quoting *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010)). To assess reliability, courts may consider "(1) whether the theory can be and has been tested, (2) whether the theory has been peer reviewed and published, (3) what the theory's known or potential error rate is, and (4) whether the theory enjoys general acceptance in the applicable scientific community." *Murray v. S. Route Mar. SA*, 870 F.3d 915, 922 (9th Cir. 2017). Courts have great discretion in determining whether *Daubert*'s specific factors are "reasonable measures of reliability in a particular case." *McClure v. State Farm Life Ins. Co.*, 341 F.R.D. 242, 256 (D. Ariz. 2022) (citing *Kuhmo Tire Co. v. Carmichael*, 526 U.S. 137, 153 (1999)). Unlike challenges to an expert opinion's relevancy or reliability, challenges to the "correctness" of an opinion go to its weight, not its admissibility. *Messick v. Novartis Pharm. Corp.*, 747 F.3d 1193, 1199 (9th Cir. 2014).

**III. DISCUSSION**

**A. David Kessler, M.D.**

Dr. Kessler is a physician and lawyer. He received his M.D. from Harvard Medical School in 1979 and his J.D. from the University of Chicago Law School in 1978. He served as Commissioner of the United States Food and Drug Administration from 1990 to 1997. Dr. Kessler also taught food and drug law at Columbia University, testified before Congress on the federal regulations of drugs and medical devices, and published numerous articles in legal, medical, and scientific journals on the federal regulation of drugs and medical devices. Additionally, he serves on the boards of two pharmaceutical companies.

Defendants do not move to preclude Dr. Kessler's testimony altogether. Rather, they seek to preclude his testimony in areas that are not the subject of proper expert testimony and his opinion of the risk of systemic illness from metal wear debris. Defendants further claim that Dr. Kessler's opinions include improper legal conclusions and that his opinions about DePuy's ethical responsibilities and knowledge comprise improper expert testimony.

Defendants argue that Dr. Kessler should be precluded from testifying as to his opinion about DePuy's duty to warn. Defendants point to several places in Dr. Kessler's expert report where he opines that DePuy failed to adequately warn of risks associated with revision due to metallosis or had a duty to warn about that risk. Defendants contend that these opinions amount to an improper legal conclusion. "[A]n expert cannot testify to a matter of law amounting to a legal conclusion." *United States v. Tamman*, 782 F.3d 543, 552 (9th Cir. 2015). Plaintiffs point out that an opinion that touches on legal issues is not necessarily precluded. Plaintiffs argue that Dr. Kessler's opinions will not encroach on the Court's role in instructing the jury on the law.

To prove a strict products liability claim based on failure to warn, a plaintiff must prove "that the manufacturer had a duty to warn of the product's dangerous propensities and that the lack of an adequate warning made the product defective and unreasonably dangerous." *Watts v. Medicis Pharm. Corp.*, 365 P.3d 944, 948 (Ariz. 2016). The Court finds that testimony about when a duty to warn is triggered is proper because a jury is not going to have the necessary understanding of medical device industry to adequately determine a medical device company's standard of care. This situation parallels standard of care testimony in medical malpractice cases. A jury must hear expert testimony about the standard of care to determine whether it was breached. However, the Court finds that Dr. Kessler's opinion that DePuy failed to adequately warn is not proper testimony. The adequacy of the warning should be decided by the jury. Dr. Kessler will be allowed to testify about problems with the warnings or the absence of warnings, but not his ultimate conclusion that DePuy failed to adequately warn.

Next, Defendants move to preclude Dr. Kessler's opinions on the ethical

responsibilities of medical device manufacturers. These ethical obligations are not legal obligations, and his opinions on the topic are merely his subjective opinions. Additionally, Defendants argue that Dr. Kessler does not rely on any written industry standards. Plaintiffs argue that they must show the failure to warn fell below the standard of care for medical device manufacturers. Dr. Kessler's opinions are tied to his experience, including as chairman of the compliance committee of a medical device company and as head of the FDA which regulated, among other things, medical devices. The Court agrees that he has the background to testify about ethical standards for medical device companies and the testimony is helpful to a jury in understanding the relevant standard of care.

Defendants also seek to preclude Dr. Kessler from testifying as to factual narratives. They complain that Dr. Kessler quotes internal DePuy documents approximately ninety times in his report. Plaintiffs respond that Dr. Kessler is simply pointing to the factual record on which he bases his opinions. Defendants cite to *Johnson v. Wyeth LLC*, No. CV 10-02690-PHX-FJM, 2012 WL 1204081 (D. Ariz. Apr. 11, 2012) for the proposition that an expert should not be allowed to merely recite or summarize documents. *Id.* at *3. However, that court also recognized that objections to narrative testimony are best made at trial. *Id.* Therefore, this request is denied.

The last area Defendants argue is improper expert testimony involves Dr. Kessler's opinions regarding DePuy's state of mind—specifically, what DePuy knew and when it knew it. Defendants cite to *Hill v. Novartis Pharms. Corp.*, No. 1:06-CV-00939-AWI-DLB, 2012 WL 5451816 (E.D. Cal. Nov. 7, 2012) in which the Court precluded an expert from opining the Defendant company engaged in "bad faith." *Id.* at *2. However, the Court did allow the expert to offer "expert opinions about the information available to Defendant internally and from relevant medical literature." *Id.* Defendants also again rely on *Johnson*, where the court said the experts "may not offer opinions concerning defendants' motive, intent, knowledge, or other state of mind." *Johnson*, 2012 WL 1204081, at *3. But that is not what Dr. Kessler is testifying about. Dr. Kessler's testimony relates to opinions about when Defendants had notice of the risks, not their state of mind.

- 6 -

He is not speculating on when they knew by pointing to the record. Therefore, this testimony will be allowed subject to objections at trial.

Finally, Defendants seek to preclude Dr. Kessler from testifying about the risk of systemic illness from metal wear debris. They argue it should be precluded because Dr. Kessler lacks the necessary expertise to make that opinion, lacks a reliable basis for his opinion, and the opinion is irrelevant because it does not fit the facts of this case. The Court disagrees. He has extensive experience on this issue from his days with the FDA, his work on company boards, and his education that would support his qualifications. He has a reliable basis for the opinion based on the Court's review of his report. With respect to "fit," Defendants argue that no expert has opined that Mr. King suffers from any systemic illness or that he will likely suffer a systemic illness in the future, so this testimony is irrelevant. Plaintiffs argue that the information is relevant to damages because Mr. King testified that he is fearful of the possible future consequences of the surgery and the need for continued medical monitoring. The Court finds that the general issue of systemic illness is relevant. However, the discussions of specific systemic illnesses may be limited under Federal Rule of Evidence 403 at trial.

**B. William R. Evans, M.D., P.A.**

Defendants move to preclude Dr. Evans' case specific opinions regarding other bellwether trial plaintiffs and his opinions concerning risks of systemic illness. Plaintiff concedes that he will not be introducing any case specific opinions regarding other plaintiffs. Therefore, the Court will not address that issue and will grant that part of the motion. As for Dr. Evans' opinions about risks of systemic illness, Defendants make several arguments. However, the Court will preclude any opinions on that issue from Dr. Evans for failure to comply with Rule 26 of the Federal Rules of Civil Procedure. Rule 26 requires Plaintiff to disclose a written report, which they have done. However, the written report must contain:

    **(i)** a complete statement of all opinions the witness will express and the basis and reasons for them;
    **(ii)** the facts or data considered by the witness in forming them;

    **(iii)** any exhibits that will be used to summarize or support them;
    **(iv)** the witness's qualifications, including a list of all publications authored in the previous 10 years;
    **(v)** a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and
    **(vi)** a statement of the compensation to be paid for the study and testimony in the case.

Fed. R. Civ. P. 26(a)(2)(B). Dr. Evans' written report does not comply with this rule. He provides no support for his very vague and limited opinions on the issue of systemic illness risks. Plaintiffs' response to Defendants' motion includes multiple references to medical literature that supports Dr. Evans' opinion. The problem is that Plaintiffs never state that Dr. Evans reviewed and relied on those articles, and Dr. Evans never indicated his reliance on those articles in his report. Therefore, Defendants' motion will be granted as to Dr. Evans.

### C. Minette E. Drumwright, Ph.D.

Dr. Drumwright is an expert in the fields of advertising, marketing, and corporate responsibility. She is a professor at the Stan Richards School of Advertising & Public Relations at the University of Texas at Austin. She holds a Ph.D. in Business Administration from the University of North Carolina at Chapel Hill. In addition to her current academic appointment, she has taught at Harvard University, the University of North Carolina at Chapel Hill, and Baylor University. Her work has included teaching, researching, and consulting in the areas of marketing and corporate responsibility, including in the medical and healthcare fields. The parties do not contest Dr. Drumwright's qualifications to testify on marketing, and "[c]ourts regularly admit marketing testimony that explains what a company intended to convey through their marketing." *Montera v. Premier Nutrition Corp.*, No. 16-CV-06980-RS, 2022 WL 1225031, at *5 (N.D. Cal. Apr. 26, 2022).

Defendants seek to exclude Dr. Drumwright's opinions regarding (1) whether the marketing of the device was misleading, inaccurate, or unsupported by science; (2) DePuy's compliance with ethical standards in marketing and selling the device; (3) the

1 effect of DePuy's marketing on orthopedic surgeons and consumers; (4) DePuy's state of
2 mind; and (5) DePuy's relationships with consultants and alleged incentives offered to
3 physicians.

4       Defendants first contend that given her lack of scientific or medical training, Dr.
5 Drumwright is unqualified to opine on the scientific accuracy of DePuy's marketing
6 statements. (Doc. 61 at 10–11.) Specifically, Defendants point to several instances in her
7 expert report, in which she concluded that DePuy "lied" or "failed to be truthful" in
8 connection with many scientific claims regarding the device. (*Id.* at 11–12.) Plaintiffs
9 counter that Dr. Drumwright properly relied on the reports and opinions of other experts
10 and then utilized her marketing expertise in formulating her own opinion. (Doc. 75 at 5–
11 7.)

12       The Court agrees with Defendants' assertions. Plaintiffs are correct in asserting that
13 an expert witness may properly rely on the reports and opinions of other experts as a basis
14 for her expert opinion. *Nat'l Union Fire Ins. Co. v. Smith Tank & Steel Inc.*, No. 3:11-CV-
15 00830, 2014 WL 5794952, at *4 (M.D. La. Nov. 6, 2014); *see also Daubert*, 509 U.S. at
16 592. However, in analyzing marketing strategies, a witness cannot restate assumptions
17 made by other witnesses unless the assumptions are used purely for background purposes.
18 *See Monster Energy Co. v. Vital Pharms., Inc.*, No. EDCV 18-1882 JGB (SHKX), 2022
19 WL 17218077, at *20–21 (C.D. Cal. Aug. 2, 2022). Dr. Drumwright has no specific
20 expertise in science or medicine, therefore making these opinions inappropriate. The Court
21 finds that Dr. Drumwright's opinions and conclusions related to DePuy's scientific
22 claims—whether the effectiveness and success of the device constituted "lies" or was
23 "false and misleading"— are precluded. However, Dr. Drumwright may testify about
24 marketing principles and strategies, including the intended message and target audience of
25 Defendants' advertising.

26       Second, Defendants contend that Dr. Drumwright's opinions on Defendants'
27 compliance with ethical standards are irrelevant because they have no bearing on the
28 relevant legal standards in this case. (Doc. 61 at 17.) Plaintiffs counter that this testimony

is directly relevant to show the standard of care for reasonable manufacturers and whether Defendants were negligent in their marketing of the device. (Doc. 75 at 11–12.)

The ethical standards at issue include Johnson & Johnson's corporate credo, company ethics policies, and voluntary compliance with ethics standards adopted by various industry groups. (*Id.*) These types of standards are a valid source when examining the applicable standard of care. *See King v. GEICO Indem. Co.*, 712 F. App'x 649, 651 (9th Cir. 2017). Opinions on ethical standards may be helpful to a jury where the ethical standards are consequential to the issues in the case. *See Erhart v. Bofl Holding, Inc.*, 445 F. Supp 3d 831, 844–45 (S.D. Cal. 2020). This is particularly true where the testimony on the ethical standards can help illuminate the proper standard of care for the jury. *See id.*; *In re DePuy Orthopaedics, Inc. Pinnacle Hip Implant Prod. Liab. Litig.*, No. 3:11-MD-2244-K, 2016 WL 9560113, at *8 (N.D. Tex. Oct. 3, 2016). The Court finds that Dr. Drumwright's testimony on the ethical standards falls within her expertise and is relevant to whether Defendants acted as a reasonable manufacturer of medical devices. Further, Defendants' challenge to these opinions bears on their weight rather than their admissibility. Defendants can challenge the applicability and persuasiveness of these ethical standards through cross-examination and the presentation of contrary evidence. *See Daubert*, 509 U.S. at 596.

Third, Defendants challenge Dr. Drumwright's testimony on the effect of DePuy's marketing on orthopedic surgeons and consumers, arguing that her opinions are speculative and not based on any special expertise or methodology. (Doc. 61 at 20.) Plaintiffs counter that Dr. Drumwright's conclusions are supported by citations to peer-reviewed articles regarding the effect of marketing claims on physicians. (Doc. 75 at 15.) Plaintiffs' assertion is correct. The Court finds that Dr. Drumwright's opinions about whether surgeons relied on Defendants' marketing materials were supported by peer-reviewed articles, which combined with her expertise in marketing, is sufficient to permit her testimony on this topic. *See Daubert*, 509 U.S. at 593–94. Again, Defendants' attack on this testimony is more appropriately reserved for the weight of the testimony rather than

its admissibility.  *See id.* at 595.

Fourth, Defendants challenge Dr. Drumwright's opinions on DePuy's state of mind as improper expert testimony that is unhelpful to the jury.  (Doc. 61 at 24–25.)  Plaintiffs argue that these opinions do not concern state of mind issues, but instead summarize the voluminous representations made by Defendants.  (Doc. 75 at 18.)  The Court disagrees.  What DePuy purportedly knew, intended, or was motivated by falls outside the scope of expert testimony.  *See Gold v. Lumber Liquidators, Inc.*, 323 F.R.D. 280, 284 (N.D. Cal. 2017); *Siring v. Oregon State Bd. of Higher Ed. ex. rel. Eastern Oregon Univ.*, 927 F. Supp 2d 1069, 10787 (D. Or. 2013).  These types of state of mind issues are squarely within the province of the jury.  *See Valenzuela v. Equifax Info. Servs. LLC*, No. CV-13-02259-PHX-DLR, 2015 WL 6811585, at *3 (D. Ariz. Nov. 6, 2015).  The jury is capable of drawing its own inferences from the evidence regarding DePuy's state of mind.  *See id.*; *Bracco Diagnostics, Inc. v. Amersham Health, Inc.*, 627 F. Supp. 2d 384, 440–41 (D.N.J. 2009).  Dr. Drumwright's opinions will not assist the jury in this task.  Therefore, the Court finds that Dr. Drumwright is not permitted to opine on DePuy's state of mind by giving opinions on the company's supposed knowledge, intent, or motivations.

Fifth, Defendants seek to exclude Dr. Drumwright's opinions on DePuy's relationships with consultants and alleged incentives offered to physicians.  Defendants argue that her opinions are subjective, rely on speculation, and are merely a "narrative gloss on internal DePuy documents and other documents that could just as easily be interpreted by the jury."  (Doc. 61 at 26–27.)  Plaintiffs argue that these opinions are "informed by both industry-wide marketing and collaboration standards and the Defendants' own internal standards."  (Doc. 75 at 20.)  Much like the applicability of ethical standards to the relevant standard of care, Dr. Drumwright's opinions on these relationships and incentives also relate to Defendants' behavior in relation to the standard of care.  The recognized industry standards, which DePuy voluntary followed, provide context for the applicable standard of care.  *See Erhart*, 445 F. Supp at 844–45; *In re DePuy Orthopaedics*, 2016 WL 9560113, at *8.  The Court finds that Dr. Drumwright's opinions on this topic fall within

her expertise and will be helpful to the jury. Therefore, they will be permitted.

However, the Court also finds that Dr. Drumwright will not be permitted to opine on the federal government's investigation of DePuy for possible violations of the anti-kickback statute related to the use of consultants and the resulting Deferred Prosecution Agreement and monitorship. In summarizing these documents, Dr. Drumwright is stepping outside her expertise in a manner that would not assist the jury. *See Monster Energy Co.*, 2022 WL 17218077, at *21. Therefore, the Court will exclude opinions stemming from Dr. Drumwright's analysis of the federal investigation of DePuy.

For the reasons stated, the Defendants' motion regarding Dr. Drumwright will be granted in part and denied in part.

**D. Stephen Li**

Defendants have moved to disqualify Dr. Li because he was previously engaged as a consulting expert for DePuy. "Courts have inherent power to disqualify an expert witness to protect the integrity of the adversary process, protect privileges that otherwise may be breached, and promote public confidence in the legal system." *In re Bard IVC Filters Prod. Liab. Litig.*, No. MDL 15-02641-PHX DGC, 2019 WL 13205592, at *2 (D. Ariz. Jan. 30, 2019) (quoting *In re Incretin Mimetics Prods. Liab. Litig.*, MDL Case No. 13md2452 AJB (MDD), 2015 WL 1499167, at *2 (S.D. Cal. Apr. 1, 2015). There are two approaches to analyzing whether to disqualify an expert: the bright-line rule and the two-part test. *Id.* "[T]he 'bright-line rule[]' requires disqualification 'where it is undisputed that the consultant was previously retained as an expert by the adverse party in the same litigation and had received confidential information from the adverse party pursuant to the earlier retention.'" *Id.* (quoting *Wang Labs., Inc. v. Toshiba Corp.*, 762 F. Supp. 1246, 1248 (E.D. Va. 1991)). The two-part test is used when the parties dispute the above factors. *Id.* In the two-part test, the court should consider "(1) whether it was reasonable for the party seeking disqualification to believe it had a confidential relationship with the expert and (2) whether the expert received confidential information relevant to the current litigation." *Id.* If the answer to both questions is "yes," then the court should consider

public policy factors. *Id.* Here, it is disputed whether Dr. Li was retained as an expert and whether he received confidential information, so the Court will use the two-part test. "The party seeking disqualification bears the burden of proving these elements." *Koch Refin. Co. v. Jennifer L. Boudreau M/V*, 85 F.3d 1178, 1181 (5th Cir. 1996).

### i. Confidential Relationship

The Court must first consider whether it was objectively reasonable for Defendants to believe that a confidential relationship existed. *Id.* The Court finds it was. It was undisputed in the pleadings and at oral argument that Defendants had a long-standing relationship with Dr. Li. Defendants began consulting with Dr. Li in connection with hip implant litigation in the 1990s. Specific to metal-on-metal hip implants, Defendants consulted with Dr. Li relating to the Pinnacle Cup System over a three-year period from 2010 to 2013.

Defendants have provided a declaration from Kenneth H. Inskeep, previous counsel for DePuy. In the declaration, Inskeep details his meetings with Dr. Li and the content of their discussions. Importantly, when Inskeep contacted Dr. Li in 2010 when litigation began involving metal-on-metal hip replacements, Dr. Li told Inskeep that he had been approached by a plaintiff's firm to potentially serve as an expert for the Plaintiffs. Inskeep told Dr. Li that he had to decline that request before he could consult with him and that he could not consult with him if he had received any confidential information from that law firm. After confirming that Dr. Li had no confidential information and that he had declined to consult for that firm, Inskeep set up their first meeting regarding the new litigation.

The first meeting occurred in Florida on October 27–28, 2010. During that meeting, Inskeep and Dr. Li discussed and analyzed the performance of Defendants' first-generation metal-on-metal hips, clinical performance of the metal-on-metal hips, claims being raised by Plaintiffs, wear debris from metal-on-metal hips, and many other issues significant to litigation surrounding metal-on-metal hips. Inskeep said that he had periodic discussions with Dr. Li in 2011 following up on the discussion in Florida. In April 2011, Inskeep sent Dr. Li materials related to a specific Pinnacle case for his analysis. Inskeep kept up the

periodic discussions with Dr. Li to discuss defense strategies, new developments in journal articles, and potential plaintiff expert witnesses. In August 2011, Inskeep and Barbara Meier had a meeting with Dr. Li in Indianapolis to discuss how to combat new issues being raised by Plaintiffs and new developments in the relevant medical literature. In October 2013, Dr. Li met with another lawyer for Defendants, David Brooks. In August 2015, Inskeep contacted Dr. Li to see if he would be willing to review and critique the report of the new expert for Plaintiffs, Dr. Burstein. Dr. Li had a long-term friendship with Dr. Burstein and said that he would not be comfortable critiquing Dr. Burstein or his report. Inskeep told Dr. Li that he understood his position, and Dr. Li assured Inskeep that he would not discuss matters involving his consulting work. During the time period of 2010 to 2013, Dr. Li invoiced Inskeep for his time in the amount of fifty-seven hours. Defendants paid Dr. Li $29,000.

Plaintiff argues, in part, that no confidential relationship existed because there was no written retention or consulting agreement. However, "a written contract is not the only way a party can reasonably assume a confidential relationship with an expert." *Simons v. Freeport Mem'l Hosp.*, No. 06 C 50134, 2008 WL 5111157, at *3 (N.D. Ill. Dec. 4, 2008). Plaintiffs also rely on a declaration from Dr. Li in which he says that he does not recall discussing any confidential information from those meetings. He suggested that he met casually with Inskeep over dinner and drinks. That seems ludicrous given he billed for his time and was paid.

The Court finds that the number of meetings and follow up phone calls, combined with the billing and payment for Dr. Li's time, support Defendants' position that they had a reasonable basis for concluding they were in a confidential relationship with Dr. Li.

### ii.     Confidential Information

Plaintiffs have suggested, despite the declaration of Inskeep, that Defendants shared no confidential information with Dr. Li. As a result, Defendants submitted several documents for ex-parte review. The documents were contemporaneously created and detail the subjects discussed in the October 2010, August 2011, and February 2012

1  meetings along with invoices for Dr. Li's time.  These documents show that Dr. Li met
2  with attorneys for Defendants for more than dinner and drinks.  The documents corroborate
3  the declaration of Inskeep that Dr. Li was given access to Defendants' litigation strategies,
4  Dr. Li discussed opposing experts and how to cross-examine them, Dr. Li and Defendants
5  identified potential problems Defendants might face and strategies to address them, and
6  that Dr. Li and Defendants periodically reviewed new scientific articles that might affect
7  the litigation strategies.  The Court finds that Defendants have met the burden to show that
8  Dr. Li and Defendants shared confidential information that is relevant to this litigation.

### iii. Public Policy

Finally, Defendants argue that public policy supports disqualifying Dr. Li.  "The court is tasked with preserving the integrity of the judicial process while considering fundamental fairness to the parties."  *In re C.R. Bard, Inc. Pelvic Repair Sys. Prod. Liab. Litig.*, MDL No. 2187, 2014 WL 6960396, at *12 (S.D.W. Va. Dec. 8, 2014).  Allowing an expert to switch sides is fundamentally unfair.  *Id.*  Plaintiffs argue that they will suffer prejudice because a trial date has already been set and they will have to suffer the cost of retaining a new expert.  As for the trial date, Defendants have stated that they will not object to a trial continuance to allow Plaintiffs to retain a new expert and the Court has indicated that it would grant more time.  Therefore, the trial date does not present any prejudice.  As to the cost, that complain alone is insufficient.  *See M&T Bank v. Worldwide Supply LLC*, No. CV206378MCAMAH, 2022 WL 16743689, at *5 (D.N.J. June 28, 2022) (finding financial burden insufficient where Plaintiff did not assert that it lacked the necessary resources or that the expert would be too difficult to replace).  Here, Plaintiffs' counsel asserted at the hearing that if the Court grants the motion to disqualify, they still intend to get a new expert and be prepared for the current trial date.  Therefore, the Court finds that public policy supports Dr. Li's disqualification.

### IV. CONCLUSION

As discussed above,

**IT IS ORDERED granting in part and denying in part** Defendants' Motion to

Exclude, in Part, the Opinions and Testimony of David Kessler, M.D. (Doc. 64) and Defendants' Motion to Exclude, in Part, the Expert Opinions and Testimony of Minette E. Drumwright (Doc. 61).

**IT IS FURTHER ORDERED granting** Defendants' Motion to Exclude, in Part, the Opinions and Testimony of William R. Evans, M.D., P.A. (Doc. 62) and Defendants' Motion and Memorandum of Law in Support of Motion to Disqualify Plaintiffs' Expert Stephen Li (Doc. 30).

Dated this 31st day of August, 2023.

_____
Honorable Susan M. Brnovich
United States District Judge